John V. **LINDSAY**, as Mayor of the City
of New York, et al., Plaintiffs,

v.

George **WYMAN**, as Commissioner of So-
cial Services of the State of New
York, Defendant.

No. 71 Civ. 802.

United States District Court,
S. D. New York.

Feb. 28, 1974.

Norman Redlich, Corp. Counsel of the City of New York, New York City, for plaintiffs; Edmund B. Hennefeld, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendant; Amy Juviler, Joel Lewittes, Asst. Attys. Gen. of counsel.

Before MULLIGAN, Circuit Judge, and METZNER and GURFEIN, District Judges.

GURFEIN, District Judge:

After a dismissal of the complaint by our · late brother, Judge McLean, the Court of Appeals remanded the claims of those individuals who were suing the state defendant, the Commissioner of Social Services of the State of New York, in their official and personal capacities to declare the New York Social Services Law unconstitutional in certain respects, with instructions to convene a three-judge district court. The Court of Appeals affirmed the district court's dismissal of all the plaintiffs' claims against the *federal* defendants. It also affirmed the dismissal of those claims asserted by *city and county* plaintiffs against the state defendant.[1] City of New York v. Richardson, 473 F.2d 923 (2 Cir.1973), cert. denied, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973).

This court is convened pursuant to the mandate of the Court of Appeals. The federal defendants are out of the case. The City of New York has been dismissed as a plaintiff. The plaintiff, Ola Bryant, described as a citizen and taxpayer, but, also as a welfare recipient of the city, is in limbo, because the question of her claim to damages in excess of the jurisdictional amount of $10,000 under 28 U.S.C. § 1331, has not been adjudicated. The issue of whether she is a proper plaintiff under 42 U.S.C. § 1983 has not been pressed. The plaintiffs now are the Mayor and the City Commissioner.

The action, as presently amended, seeks a declaratory judgment and injunction to declare invalid under the Equal Protection Clause of the Fourteenth Amendment, the provisions of the New York Social Services Law, McKinney's Consol.Laws, c. 55 referred to

in the amended complaint[2] that divide the State of New York into Social Services districts and in so doing allegedly achieve an unequal and discriminatory distribution of the burden of public assistance costs and payments in the State, and the imposition of local taxes accordingly.

The plaintiffs move for summary judgment and the defendant cross-moves for summary judgment.

The facts are not in serious dispute. We cannot state them more concisely than Chief Judge Kaufman did on the appeal in 473 F.2d 923, at 926–927 as follows:

"The Social Security Act provides, *inter alia,* for public assistance to the aged, Title I, 42 U.S.C. § 301 et seq., to families with dependent children, Title IV, 42 U.S.C. § 601 et seq., to the blind, Title X, 42 U.S.C. § 1201 et seq., and to the permanently and totally disabled, Title XIV, 42 U.S.C. § 1351 et seq. Funds provided in accordance with the Social Security Act are not distributed directly to individuals eligible for assistance; instead, as part of what has been called a "scheme of cooperative federalism," King v. Smith, 392 U.S. 309, 316, 88 S. Ct. 2128, 20 L.Ed.2d 1118 (1968), federal funds are made available on a matching-fund basis, for administration by the states. No state is required to participate in any program offered under the Social Security Act, but those states that wish to receive federal financial aid for local public assistance must submit to the Secretary of HEW, and have approved by him, a state plan for such assistance. Each plan, to obtain approval, must comply with certain provisions of the Social Security Act and with rules and regulations issued by HEW. Thus,

---

1. The original plaintiffs were the City of New York, and three individuals—John V. Lindsay, the Mayor of the City of New York, Jule Sugarman, the Commissioner of Social Services of the City of New York, and Ola Bryant, a taxpaying citizen and resident of New York City. We consider the newly elected Mayor and the newly appointed City Commissioner as the plaintiffs under

Fed.R.Civ.P. 25(d)(1). The original federal defendants were the Secretary of Health, Education and Welfare of the United States, the Secretary of the Treasury of the United States, and two regional officers of H.E.W.

2. The sections of the State law under attack are: §§ 62, 91, 92, 131, 131–a, 153, 154, 356, 365 and 368–a.

subject to certain limited exceptions, a state plan will not be approved unless it provides 'for the establishment or designation of a single state agency with authority to administer or supervise the administration of the plan.' 45 C.F.R. § 205.100(a)(1). The plan must be in effect 'on a statewide basis in accordance with equitable standards for assistance and administration that are mandatory throughout the State.' 45 C.F.R. § 205.-120(a). State funds must be used for both assistance and administration and on no account may State participation total less than 40% of the non-federal share of the total expenditure, 45 C.F.R. 205.130(a)(1), (c). There is no requirement that local governments contribute to the cost of a state's welfare expenditure, but 'if there is local financial participation there [must] be a method of apportioning State and Federal funds among the political subdivisions of the State on an equalization or other basis that will assure that lack of funds from local sources does not result in lowering the amount, duration, scope, or quality of care and services or level of administration under the plan in any part of the State.' 45 C.F.R. § 205.-130(c)(2).

"States submitting an approved plan to the Secretary of HEW may choose between two reimbursement formulae. The first of these, see 42 U.S.C. §§ 303, 603, 1203, 1353, 1383, is based upon a sliding percentage calculation of certain fixed dollar allotments for each of the four public assistance programs covered by the Social Security Act. The second, the 'Medicaid' formula, see 42 U.S.C. § 1318, takes into account not fixed but actual payments made by a state for public assistance and is based upon a sliding percentage scale, with a minimum reimbursement level to the states of 50%. The Medicaid formula contains a factor based upon the ratio of the square of the state's per capita income to the square of the per capita income of the nation as a whole. Under the formula relatively 'poorer' states are reimbursed at a higher percentage than rela-

tively 'richer' states. New York State, whose plan was approved by the secretary of HEW, opted for the Medicaid formula under which the federal government reimburses New York for 50% of its total welfare costs.

"New York State's approved plan divides the state into geographic social services districts. New York City is one such social service district, see Social Services Law, McKinney's Consol. Laws, c. 55, § 61(1), and is consequently 'responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself.' Social Services Law § 62(1). The state plan sets standards for eligibility, payments schedules and the conditions of administration, and requires each local social service district to finance its own public needs, subject to the following reimbursement provision in New York Social Services Law, § 153:

'Reimbursement and advances by the state.
1. . . . .
There shall be paid to each such [public welfare] district, city or town
a. the amount of federal funds, if any, properly received or to be received on account of such expenditures;
b. . . . .
c. fifty percentum of the amount expended for public assistance and care for local charges, after first deducting therefrom any federal funds properly received or to be received on account thereof.'

"The net effect of the combined federal-state programs is that payments for assistance in federally-aided categories are provided as follows:

| | |
|---|---|
| Federal revenue: | 50% |
| State revenue: | 25% |
| Local revenue: | 25%" |

The plaintiffs complain that this formula violates the Equal Protection Clause of the Fourteenth Amendment,

because the City of New York is required to carry a heavier burden of public assistance costs than the rest of the State, since a disproportionately larger number of persons who receive public assistance reside in the City of New York and because the City is required to raise its mandated share of the cost by local taxation of its residents.

The plaintiffs argue that it is not the fault of the City or its residents that migrants from the South and Puerto Rico, who are generally poor, largely choose to make their new homes in the City rather than in other parts of the State, and that the State should not mandate the level of payments required to be made by the City.

The City notes that in the year 1969, for example, while only 45% of the State's residents were living in New York City, that the City was responsible for fully 74% of the entire welfare burden of the State. Moreover, it is noted that in the same 1969 year, 12.52% of the City residents received public assistance against an average of 3.49% for the balance of the State. By 1972, the percentage of the State's welfare recipients in New York City was 70% against 30% for the balance of the State—a considerable difference. By 1972, 16.03% of the City's population was on welfare against 5.04% outside New York City. Finally, by 1971, New York City was expending $151.47 per inhabitant on welfare against an expenditure of $44.23 by inhabitants of other parts of the State. The City's share of public assistance expenditures was $869,060 in fiscal year 1972-73; the State's share was $881,788. The federal government contributed $1,454,843. The actual source of funds expended in the City was 45.4% federal, 27.5% state, and 27.1% city. (D. Ex. 1, attached to defendant's affidavit).

The conclusion is, of course, inescapable that New York City bears a heavier share of the welfare costs than the rest of the State, because a proportionately larger percentage of welfare recipients live within its borders. The question to which we must address ourselves is whether this is constitutionally permissible under the Equal Protection Clause of the Fourteenth Amendment.

We have studied the brief of the State-appellee upon the appeal from Judge McLean's order. Although the brief tendered was adequate on other points, it failed to discuss any significant rationale for justifying the State's welfare plan. In the brief and affidavit before us, however, that deficiency has been remedied. The Court of Appeals in remanding to this Court said that "[i]n directing the convening of a three-judge court we intimate no views on the ultimate merits of the constitutional claim to be adjudicated by that Court." 473 F.2d at 933, n. 10.

Since the opinion in this case was filed by the Court of Appeals on January 26, 1973, the Supreme Court has decided San Antonio Independent School District et al. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Since then the Supreme Court has also affirmed, without opinion, State ex rel. Seehawer, Rooney and Racine County v. Schmidt, 414 U.S. 1105, 94 S.Ct. 832, 38 L.Ed.2d 734 (1973), the decision of a three-judge court in the Eastern District of Wisconsin. The Supreme Court has now given us guidelines for constitutional analysis in this kind of equal protection attack which were not clear at the time the Court of Appeals for the Second Circuit remanded to this Court.

Our Court of Appeals held only that the present plaintiffs have standing and that there is a question substantial enough under Ex Parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933), to merit the convening of a three-judge court.

The determination that there is standing to sue does not, of course, determine whether the issue presented is justiciable. Flast v. Cohen, 392 U.S. 83, 100, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Here, however, our Court of Appeals has sustained our jurisdiction under 28 U.S. C. §§ 2281, 2284, and we may assume that there is a case or controversy in the

constitutional sense. Cf. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Our inquiry must begin, however, with a determination of what tools of constitutional analysis are available to us under current doctrine. In recent times, there has been a burgeoning reliance on the Equal Protection Clause of the Fourteenth Amendment to justify judicial intervention.

The boundaries to such intervention have been set, on the one hand, by the memorable remark of Stone, J., that the Supreme Court is not to sit "as a super-legislature," Colgate v. Harvey, 296 U.S. 404, 441, 56 S.Ct. 252, 80 L.Ed. 299 (1935) (dissenting opinion)—a remark even more relevant for an inferior court—, and on the other hand, by Mr. Justice Douglas' observation that the Equal Protection Clause goes no further than to forbid "invidious discrimination." See Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

■ To determine whether there is an invidious discrimination, there must be a finding of a class upon which the discrimination is practiced. Such a discrete class has been found in cases which have held that the Equal Protection Clause forbids the particular discrimination. Illustrations abound. Some of these discrete classes have been: Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (black children); Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L. Ed.2d 1485 (1957) (sellers of money orders in Illinois); Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) (criminal insane); Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (voters); Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966) (prisoners); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (needy persons); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (women); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (unmarried persons); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (illegitimate children); James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972) (indigent defendants); Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (primary voters).

■ If the class purportedly the subject of discrimination is a suspect class or a fundamental constitutional right is at issue, see Shapiro v. Thompson, supra, 394 U.S. at 634, 89 S.Ct. 1322, 22 L.Ed.2d 600, strict judicial scrutiny may be required. But if there is no suspect class, and no fundamental constitutional right is at issue, the Supreme Court has told us, in San Antonio, supra, that the test is simply "whether it [the legislative scheme] rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." 411 U.S. at 17, 93 S.Ct. at 1288.

■ Under this test, we must start our inquiry by finding the class affected by the legislative scheme and whether it is a suspect class. In the case before us, there is no "gerrymandering [of] the standard of need," Jefferson v. Hackney, 406 U.S. 535, 557, n. 6, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972) (Mr. Justice Douglas, dissenting). Every welfare recipient in the State gets the same amount of welfare payment whether he lives in or out of New York City. Social Services Law §§ 131–a, 153.

Since all welfare beneficiaries get equal treatment throughout the State, they do not constitute a class discriminated against. The standard of need and the State's response to that need are not affected by the legislation involved, and there is no suspicion of racial overtones. We must, therefore, look elsewhere than to the needy themselves to find the class discriminated against.

██ Under the present legislative scheme, that class can only be the City itself, or the taxpayers of the City. We cannot treat the City as the putative victim of discrimination by the State, because the municipality may not avail itself of the protection of the Equal Protection Clause. Williams v. Mayor of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed. 1015 (1933). Chief · Judge Kaufman so held in dismissing the City itself as a plaintiff in this cause. 473 F.2d 923, 929. If we posit that the burden imposed on the City's taxpayers is heavier than that imposed on other taxpayers in the State, the test to be applied under *San Antonio, supra,* is whether the scheme "rationally furthers some legitimate, articulated state purpose." As the Court said in Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972): "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket."

██ Since the class which is the purported object of discrimination is the City's residents in the aggregate, *qua* taxpayers, we must also be reminded that "[t]he Due Process Clause of the Fifth Amendment does not protect taxpayers against increases in tax liability. . . ." Flast v. Cohen, 392 U.S. 83 at 105, 88 S.Ct. 1942 at 1955. Nor is there a claim here, as there was in Flast v. Cohen, *supra,* that the expenditure itself violates a specific constitutional prohibition. In this regard, we think the principle to be just as applicable to claims of discrimination under the Equal Protection Clause of the Fourteenth Amendment as under the Due Process Clause of the Fifth Amendment. We return, therefore, to the concept of rational justification.

The able Corporation Counsel of the City in his brief states the issue as follows: "Challenge is made to the provisions in question on the ground that, drawing the boundaries of the State social service districts as they do, they discriminate, arbitrarily and without rational justification, against the *residents of New York City.* Those residents bear a greater burden of the welfare costs of the State because the City has, vis-a-vis all the other State social service districts, a significantly greater proportion of welfare recipients living within its social service jurisdiction." (Pl. Br. at 2.) (Emphasis supplied.)

The discrimination of which complaint is made is not against welfare recipients as a class, but rather against residents of the City who pay taxes to support the city budget. It is not against the person who is benefited, but against the person who pays taxes to confer the benefit. The City states quite frankly that "[d]iminished taxes or increased services, or an admixture of the two, is precisely the goal of the present litigation." (Pl. Reply Br. at 7.)

██ The complaint appears to be that the drawing of the boundaries of the State Social Service districts to make the City a single district is arbitrary and without rational justification. We cannot agree. "The Equal Protection clause does not place a state in a vise where its only choices in dealing with the problems of welfare are to do nothing or plunge into statewide action." Aguayo v. Richardson, 473 F.2d 1090, 1109–1110 (2 Cir.1973), cert. den. sub nom., Aguayo v. Weinberger, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974).

The burden imposed upon City residents is not a discriminatory burden imposed upon them by the State because they *happen* to live in the City. That view of the matter does not, in our judgment, go to the heart of the matter. The heavier burden imposed upon residents of the City falls upon them only because they are residents of a city which is a separate unit of government. Just as in the total national welfare cost, there is an allocation of burden between the federal government and the states, so there is an allocation of burden between the State of New York and the City of New York. Just as, under

the Medicaid formula, New York State gets less proportionately than poorer states do, so under the Social Services Law, the City of New York gets proportionately less on a per capita basis, though not on a percentage basis, than poorer districts do.

To be sure, the reason why the Medicaid formula is proper is because the States have the obligation to support welfare, and the contributions by the federal government are in the nature of volunatry grants in aid. A formula which is designed to apportion fiscal responsibility according to ability to pay, and which ,uses per capita income as the basis of determining ability to pay would not seem to us to be without a rational basis. So, too, we believe that, as between the City and State, welfare has historically been a function of the local unit of government. State reimbursement is in aid of the local obligation. The formula of State reimbursement need not be limited simply to a count of the number of persons on welfare. If the burden of welfare were *solely* a state responsibility, the City of New York, *qua* city, would have no responsibility for welfare, and the disproportionate burden on its residents imposed by the State might be facially discriminatory.

The choice of the City, a functioning governmental unit, as a single Social Service district can hardly be completely irrational, however. It is a logical unit for administration, and a unit which, historically, had an obligation to provide welfare as part of its municipal services. There are no county governments within the City of New York, and the boroughs are not independent revenue raising governmental entities.

The scheme arrived at by Congress in the Social Security Act of 1935 provided for "cooperative federalism," see King v. Smith, 392 U.S. 309, 316, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), between the Federal Government and the States,

upon whom had rested the whole burden of the poor and needy before the advent of Federal aid.[3] Congress determined that federal grants in aid were essential. The present Act provides for State plans which require that no less than forty percent of the non-federal expenditure on the local government level must be paid by the State. The Act acknowledges that the States may require (though they need not, 45 C.F.R. § 205.-130(c)(2)), local participation in the cost of public assistance. This is recognition of the historic obligation of local government to care for the poor and the needy.

It is true that the State mandates the level of payment under the State plan for welfare benefits, and that this creates an inflexible burden on the budget of the City of New York. But it is also true that the Legislature may base its failure to provide *more* than across-the-board contributions to the City, as it now does, on several rational grounds. It may take into account that welfare, historically, is an obligation of local government. It may recognize that the greater property values in the City of New York and its greater per capita wealth enable it better to carry its burden of welfare. Conversely, the Legislature must be careful, in determining the contribution of the State to local costs, to use a method of apportioning State and Federal funds among the political subdivisions of the State to assure that lack of funds from local sources "does not result in lowering the amount, duration, scope, or quality of care and services or level of administration under the plan in any part of the State." 45 C.F.R. § 205.130(c)(2), *supra*. We do not know whether casting a relatively heavier burden on poorer counties under a new formula would satisfy this federal requirement.

State participation in cost-sharing with the Federal Government is entirely optional. King v. Smith, *supra*, 392 U.S.

---

3. Report of the President of the Committee on Economic Security, pp. 1, 26–27, 36. (Washington, G.P.O. 1935).

at 316–317, 88 S.Ct. 2128, 20 L.Ed.2d 1118; Rosado v. Wyman, 397 U.S. 397, 408, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). And the level of payments in the State is determined at the will of the State Legislature. While each state is required to establish a minimum needs standard, upon which assistance payments are based, 45 C.F.R. § 233.-20(a)(2), a state is not required to pay the full difference between a family's income and its needs standard. Each state under the Act is completely free to set needs standards and payment schedules at whatever levels it deems advisable. See 42 U.S.C. §§ 301, 601, 1201, 1351, 1381. And see King v. Smith, *supra*, 392 U.S. at 318, n.14, 88 S.Ct. 2128, 20 L.Ed.2d 1118.

· Thus, the standard of need under AFDC for a family of four without income was established in New York as $336 per month. New York State chose to pay 93% of this standard, or $313. California established a standard of need of $274 per month, of which it chose to pay 95%, or $261. Mississippi, with a needs standard of $277, pays 22% thereof, or $60. U.S. Dept. HEW, National Center for Social Statistics; NCSS Report D–2, March, 1972.

If this Court were to decide that the present plan is unconstitutional, the State could lower the level of welfare payments throughout the State to the detriment of the needy, for, as we have seen, the Federal Government mandates no level of payments. As an alternative, it might raise the *State* income tax or the *State* sales tax which might not, in the end, afford substantial relief to the City resident who also pays taxes to the State. It could also assume a larger burden of welfare and still leave the present grant of revenue raising powers granted to the City without change, thereby in no way lightening the tax burden of the City resident, while giving him additional services. On the other hand, the State could withdraw certain taxing powers granted to the City, and exercise such powers itself.

The City of New York has separate taxing powers of its own granted by the State Legislature. Special revenue raising powers are given to the City from time to time by the State Legislature after review of the City's budgetary needs. These decisions may have turned, rationally, on the minimal needs of the City in the supply of municipal services, including welfare. They may have included, rationally, consideration of the additional costs of welfare to the City of New York, because of its huge welfare burden. We simply do not know the extent to which the welfare requirements of the City under the present Social Services Law prompted the Legislature to grant additional revenue raising powers to the City of New York that it might not otherwise have granted.

We recognize the permutations of legislative possibilities in this field, and the essentially political nature of the struggle that goes on in the State Legislature at periodic intervals between the total needs of the City Government and the relative obligation of the State to supply them. Education is one such field; welfare is another.

We have been cited to no case where the class allegedly discriminated against under the Equal Protection Clause are the taxpayers of a City, and the constitutional claim, which the City itself could not bring against the State, Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed. 1015 (1933), or against the State Commissioner, City of New York v. Richardson, 473 F.2d 923, 929 (2 Cir. 1973), Aguayo v. Richardson, 473 F.2d 1090, 1109 (2 Cir. 1973), cert. den. sub nom., Aguayo v. Weinberger, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974), is brought by a city official to protect the local taxpayers against an allegedly discriminatory tax burden imposed by the City under the general compulsion of a State mandate. Nor are we cited to precedent which holds that the Equal Protection Clause of the Fourteenth Amendment permits the courts to interfere with fiscal allocations between City

and State enacted by a state legislature. Cf. *San Antonio, supra; Seehawer, supra*. That is not to say that such action may never be the subject of judicial intervention. But the "page of history" of Justice Holmes is a value judgment of persuasive force.

The history of social welfare makes it quite clear that assistance to the needy has been the primary responsibility of the immediate locality. The English Poor Laws of the 16th and 17th Century, the first acceptance of governmental responsibility for the needy, were based on the principle that the "impotent poor" must be relieved in and at the cost of the local community, 27 Henry VIII, c. 25, §§ 4, 21; 4 Holdsworth, History of English Law 392–94 (1923). We turn our attention first, then, to its history in the State of New York.

Until 1824, relief of the poor in New York State was a matter for private charities and local governments at their option, although general state laws provided the legal framework for local governmental units' jurisdiction (Fensterstock, "History of New York Social Welfare Legislation," McKinney's Social Welfare Law pp. IX–XVIII; Schneider, "The History of Public Welfare in New York State, 1609–1866," University of Chicago Press, 1938 pp. 1–210). Thereafter, County responsibility for the poor was established as a State goal but in fact in many Counties the localities still bore the major responsibility (Fensterstock, *supra*, at pp. XVIII–XXIII; Schneider, *supra*, at pp. 233–53). While a Board of State Commissioners of Public Charities was established in 1867 and many laws followed which established state-wide policies regarding the care of sick, disabled and poor, no state monies were disbursed until the Depression.[4]

By 1929, responsibility for relief of poverty had been placed clearly on the County governments and on several Cities including New York (Schneider and Deutsch, "The History of Public Welfare in New York State, 1867–1940," University of Chicago Press, 1941 pp. 285–86.)

The gradual elimination of non-county districts continued until 1972 when all were eliminated except for New York City which completely contains five counties and has no effective County government. (L.1972 ch. 28).

The importance of partial local responsibility for public assistance is a recognized tenet of the public policy of the State of New York. See New York State Constitution, Art. 7 § 8(2), McKinney's Consol.Laws:

"Subject to the limitations on indebtedness and taxation, nothing in this constitution contained shall prevent the legislature from providing for the aid, care and support of the needy directly or through subdivisions of the state."

The validity of such a system was recognized by Congress in permitting local administration of federally aided public assistance categories as long as there was a State Plan which was mandatory upon those localities and the plan operated all over the State (42 U.S.C. §§ 401, 601, 1201 and 1301).

The fact that poverty is a national problem does not mean that it is not a local one, as well. Under the statutes attacked, the major fiscal burden is borne by the national government which contributes 50% to the federally aided categories (42 U.S.C. § 1318) and the State contributes roughly 25% so that the participation of the locality is unreasonable only if it is unreasonable for the people of the State to perceive the problem of poverty as 25% a local problem.

In 1930 (L.1930 ch. 387) old age relief by the Counties was reimbursed by the State, and the "Wicks Act" of 1931 (L. 1931 chs. 798–799) provided for State

---

4. As late as 1923, Governor Alfred E. Smith was unable to get the Legislature to pass a bill authorizing State grants in aid of 25% of annual mothers' allowances by the localities. Schneider and Deutsch, "The History of Public Welfare in New York State, 1867–1940," University of Chicago Press, 1941 p. 260.

reimbursement to local governments of 40% for home relief and 50% for administering work relief (Fensterstock, *supra,* at pp. XXIII–XXXVIII; Schneider and Deutsch, "The History of Public Welfare in New York State 1867–1940, pp. 308–10). The preamble to the Wicks Act declared that "While the duty of providing aid . . . is primarily an obligation of the municipalities," state assistance was necessary. *Id.* p. 308. Governor Franklin D. Roosevelt in his August, 1931 message to a Special Session of the Legislature noted that "When . . . a condition arises which calls for measures of relief over and beyond the ability of private and local assistance to meet,—even with the usual aid added by the State—it is time for the State itself to do its additional share." *Id.* p. 307.

If historically then, it is a function of city government to support the poor and needy, whatever the State contributes is a grant in aid of what is at least a partial municipal obligation.

In determining to enact a *percentage* contribution which is equal for all Social Service districts, including the City of New York, the Legislature could take into account that balanced against the larger proportion of welfare recipients in the City is the larger proportion of wealth and per capita income. Indeed, just as the City is unique in its attraction for migrants from other states and the Commonwealth of Puerto Rico, so it is unique in the number of large foreign corporations resident in the City, the large number of visitors, the large number of commuters from outside the City, and the large number of nonresidents, all of whom pay a variety of local taxes.[5]

Concretely, the Legislature had the right to take into consideration that New York City has an assessed valuation of real property which is 53.3% higher than that in the entire rest of the State—$35,329,419,599 as opposed to $23,038,607,935 (D.Ex.6). Dividing that valuation by the number of public assistance cases in 1971 (D.Ex.8), New York City had $74,441 of evaluation per case. For the rest of the State, the figure was $11,735 per case. The City's total revenues in 1971 were $5,405,500,847—134.1% higher than the total revenues for the rest of the counties—$2,308,656,320 (D.Ex.7).

We turn then to the latest word of the Supreme Court in *San Antonio, supra,* to relate the impact of that decision on the scope of the Equal Protection Clause to the controversy at issue. There a class action was brought on behalf of school children, who were said to be members of poor families residing in school districts having a low property tax base, challenging reliance by the Texas school-financing system on local property taxation as unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court held the Texas system constitutional.

In doing so, the Court applied as the proper test, a rational relationship to a legitimate state purpose and held that it was inappropriate to apply the strict judicial scrutiny test. It found that the system assured basic education for every child in the state and permitted and encouraged participation in and significant

5. Some of the benefits afforded to the City of New York in taxing nonresidents are disclosed in Chapter 46 of the Administrative Code; for example, the Earnings Tax on Nonresidents (Title U), the Cigarette Tax (Title D) which falls to some extent on nonresidents; the Commercial Rent or Occupancy Tax (Title L) which affects foreign corporations; the tax on foreign as well as domestic financial corporations (Title R, [Part III]); the Foreign and Alien Insurers Tax (Title H); the General Corporation Tax (Title R, [Part II]) imposed on foreign corporations for the privilege of doing business, or employing capital, or owning or leasing property, or maintaining an office in the City of New York; Hotel Room Occupancy Tax (Title VV); Insurance Corporation Tax (Title R, [Part IV]); and Transportation Corporation Tax (Title R, [Part V]) which includes taxes on foreign corporations engaged in aviation.

control of each district's schools at the local level.

In *San Antonio*, the affected class was not the taxpayers, but the children, a class we think closer to the umbrella of protection under the Equal Protection Clause. Indeed, the protection sought here for the taxpayer class, as we have seen, might well cause a lowering of welfare payments throughout the State.

As far as the school districts themselves were concerned, the plurality opinion, in *San Antonio* at least intimated that discrimination against local districts as such would not give rise to an equal protection claim. 411 U.S. at 28, n. 66, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16. As far as imposition of a tax on property owners is concerned, Mr. Justice Powell said: "We are asked to condemn the State's judgment in conferring on political subdivisions the power to tax local property to supply revenues for local interests. In so doing, appellees would have the Court intrude in an area in which it has traditionally deferred to state legislatures. This Court has often admonished against such interferences with the State's fiscal policies under the Equal Protection Clause." 411 U.S. at 40, 93 S.Ct. at 1300. The Court noted further that those who wished to invalidate the Texas system "offer little guidance as to what type of school financing should replace it." 411 U.S. at 41, n.85, 93 S.Ct. at 1301.

The mandating of welfare payments by the State in the case at bar was, to some extent, paralleled by the obligation imposed in the Texas system requiring each school district to fulfill its local Fund Assignment by the compulsory imposition of an *ad valorem* tax on property located within its borders.

Although, as we have said, the class directly affected in the *San Antonio* case were not the local district taxpayers, such a class was actually involved in the later case of State ex rel. Seehawer, Rooney and Racine County v. Schmidt, 363 F.Supp. 635 (D.C.1973), a decision of a three-judge court filed on July 9, 1973, and affirmed without opinion, by the Supreme Court, 414 U.S. 1105, 94 S. Ct. 832, 38 L.Ed.2d 734 (1973).

There the plaintiffs brought an action under 42 U.S.C. § 1983 claiming that § 49.52 of the Wisconsin Statutes was in violation of the Equal Protection Clause of the Fourteenth Amendment. Section 49.52 involves a legislative scheme for partially reimbursing Wisconsin counties for the non-federal portion of categorical assistance payments made to welfare recipients within the counties. The section contains a sliding scale for reimbursement whereby state funds are paid to the counties in an inverse relationship to the value of general taxable property within each county. Thus, "richer" counties receive as little as 45% (the plaintiff Racine County receives 50%), whereas "poorer" counties receive as much as 80% reimbursement.

The District Court noted that "[s]ince the formula does not reflect the number of welfare recipients in each county, a county with a great number of welfare recipients and a high total property value pays out relatively more and recovers relatively less than a county with a lesser number of welfare recipients and a lower total property value. The amount not reimbursed must come from the county's property taxes. This result, it is urged, violates the equal protection rights of citizens residing in wealthier counties with greater numbers of categorical assistance recipients."

The District Court sustained the Wisconsin scheme against the constitutional attack. It recognized that the problem could be obviated by the State's assuming the entire cost, or by casting a more balanced burden on the counties, but concluded that the court is not the proper body to made such determinations.

Though the Supreme Court was divided in *San Antonio* where the alleged discrimination was against the school children, the Court was unanimous in affirming *Seehawer* where the alleged dis-

crimination was against taxpayers of wealthier districts.

We think that the affirmance by the Supreme Court in *Seehawer, supra,* confirms our view of the teaching of *San Antonio.*

 The Legislature in the Social Services Law did not articulate the considerations that led to the across-the-board reimbursement formula of 25%, and the creation of the City of New York as a separate Social Service district with correlative mandated obligations. Nevertheless, if the plan adopted has a rational basis in fact, we cannot condemn it unless "investigation in these fields would not disclose a basis for the legislation which would lead reasonable men to conclude that there is just ground for the difference here made." Lawrence v. State Tax Commission, 286 U.S. 276, 283–284, 52 S.Ct. 556, 558, 76 L.Ed. 1102 (1932). The Legislature is not required to "record a complete catalogue of the considerations which move its members to enact laws." Carmichael v. Southern Coal Co., 301 U. S. 495, 510, 57 S.Ct. 868, 81 L.Ed. 1245 (1937). See also Becker v. Levitt, 489 F.2d 1087 (1973).[6]

We think that appellee has demonstrated, and investigation has disclosed, that there is a rational justification for the Social Service Law.

 History teaches, and logic does not rebut, that care of the needy is, at least in part, a function of local government. The scheme of social welfare is, hence, a cooperative effort between State and City, as it is between the State and the Federal Government. If reimbursement by the State is considered as State aid, as reimbursement to the states is considered Federal aid, then the amount of such aid is a matter for legislative determination. It is rational for the Legislature to consider the financial ability to pay of independent units of local government, as a result of which a resident of New York City is indirectly compelled to bear a burden of welfare that is greater than that which is borne by a resident of Buffalo or of Franklin County. But that may be true in other fields as well. Educational reimbursement formulae have gone through the refining process of public discussion, legislative debate, and undoubtedly the kind of compromise between City and State representatives that is the essence of political life. It is not for a federal court to weigh the compromise on a jeweler's scale.[7]

Although the City of New York pays more for welfare in the aggregate because of the larger number of recipients who are resident here, the State, by the same token, reimburses the City in an amount vastly greater than is given to the rest of the State.

Congress recognized in the statute that there would be local participation in public assistance and mandated that the State must pay at least forty percent of the non-federally reimbursed costs.

---

6. A commentator has implied that there ought to be some evidence, perhaps, that the state had thought about the rationale that satisfied the Court, Gunther, The Supreme Court, 1971 Term, Forward: In Search of Evolving Doctrine on a Changing Court: A Model for A Newer Equal Protection, 86 Harv.L.Rev. 1, 45 (1972), but the suggestion does not appear to have been followed by the Supreme Court as a uniform principle.

7. Even if there were some differences in welfare benefits, that would not constitute the invidious discrimination outlawed by the Equal Protection Clause. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). We have been instructed that in "the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." 397 U.S. at 485, 90 S.Ct. at 1161. Here we need not determine whether the classifications are imperfect, for there are no discriminatory classifications among the welfare recipients. With respect to the indirect burden of taxation, the Supreme Court has said "Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation." Carmichael v. Southern Coal Co., 301 U.S. 495, 509, 57 S.Ct. 868, 872, 81 L.Ed. 1245 (1937).

New York State pays more than the statute requires—fifty percent. The Secretary of HEW also approved this state plan as "equitable."

Nor has there been a specific suggestion of what a more rational formula would be. A takeover of all public assistance by the State is not in our power to command. Anything less involves a bargaining between the State and the City in the ongoing political process of accommodation. We find no precedent for intervention by the federal courts in so delicate and difficult an area of fiscal give and take. City voters are also State voters. The equalization of the power of City voters in the State Legislature is not a matter before us. There is, in this case, no specific state or city tax that is assailed as discriminatory and no discrimination against a class that is suspect. Mandating a city to make public welfare payments may seem unfair, but, as we have seen, the City is not within the protection of the Equal Protection Clause. We hope that the urban crisis will encourage both the federal and state governments to help the cities even more than they have. Recent action looking to increased revenue sharing is a step in that direction. One can reasonably say that the Federal Government should take responsibility for all public welfare, or that, at least, the State should relieve local government of all responsibility for it, but we think federal judges are not the ones to say it. We hope that elected public officers will set themselves to the task of evolving a continuing redefinition of responsibility for public assistance programs in the executive chambers and in the legislative halls of the nation, both state and federal.

The motion of the plaintiffs for a declaratory judgment and an injunction is denied. The motion of the defendant for summary judgment is granted.

It is so ordered.