155 N.J. Super. 520 (1978)
382 A.2d 1175
HARRY BONNET ET AL., PLAINTIFFS-APPELLANTS,
v.
STATE OF NEW JERSEY ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 24, 1977.
Decided January 24, 1978.
*522 Before Judges CONFORD, MICHELS and PRESSLER.
Mr. William L. Brach argued the cause on behalf of appellants (Messrs. Brach, Eichler, Rosenberg & Silver, attorneys; Messrs. William L. Brach and William H. Eaton on the brief).
Mrs. Erminie L. Conley, Deputy Attorney General, argued the cause on behalf of respondents (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen *523 Skillman, Assistant Attorney General, of counsel and on the brief).
Ms. Sandra T. Ayres, Assistant Deputy Public Advocate, argued the cause on behalf of amici, the Public Advocate and the Mercer County Mayors Advisory Committee (Mr. Stanley C. Van Ness, Public Advocate, attorney).
The opinion of the court was delivered by CONFORD, P.J.A.D.
This class action challenges the constitutionality of the New Jersey system of financing welfare and judiciary-administration functions through state-mandated costs imposed upon the counties, to be met through local realty taxes assessed therein. Plaintiffs assert that this system results in a denial of equal protection under the Federal and State Constitutions, a violation of the principle of uniformity of taxation contained in the State Constitution, and the negating of a so-called "implicit premise of local government."
Plaintiffs commenced the action in 1972 asserting that the present system of state-mandated costs upon counties to finance welfare and judiciary-administration functions results in substantially disproportionate fiscal burdens on counties in violation of the constitutional provisions mentioned. The demand was to have the statutes allocating such costs declared invalid, the municipalities and counties enjoined from levying and collecting local real property taxes for such purposes, and the defendants ordered to seek alternate sources of fiscal support for these functions.
In January 1973 the matter was certified by the Law Division as a class action. Of the original class plaintiffs (see Bonnet v. State, 141 N.J. Super. 177, 190 (Law Div. 1976)), only certain taxpayers, black residents and low-income families of Essex County, and the City of Newark (in its status as a property owner) were held to have standing, 141 N.J. Super. at 192-193, 197-208. The County of Essex and its constituent municipalities were held to be without *524 standing. Id. at 207. The League of Women Voters was permitted to intervene as party plaintiff. All of the original plaintiffs are appellants.
Defendant State of New Jersey, on behalf of all defendants, moved to dismiss on the ground that the complaint failed to state a claim upon which relief could be granted. The trial court denied the motion in March 1973. In April 1973 the Appellate Division granted the State's motion for leave to file an interlocutory appeal from that order. In January 1974 the Appellate Division affirmed the denial of the motion to dismiss, noting that Robinson v. Cahill, 62 N.J. 473 (1973), cert. den. sub nom. Dickey v. Robinson, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973), had not ruled out the possibility of the successful maintenance of an equal protection attack in this context. 126 N.J. Super. 239, 243-244. The Supreme Court subsequently denied the State's motion for leave to appeal from the decision of the Appellate Division.
The case was tried before Judge Dwyer in the Law Division. He held that the system of state-mandated costs at issue was violative of none of the constitutional precepts invoked by plaintiffs. Bonnet v. State, supra. Final judgment was entered in accordance with the written opinion on March 5, 1976, dismissing the complaint in all respects. All plaintiffs appealing, the Public Advocate and the Mercer County Mayors Advisory Committee were granted leave to file an amicus brief.
Plaintiff's initial complaint on this appeal is the dismissal of Essex County and its constituent municipalities (except Newark) as plaintiffs, for lack of standing. We need not review the correctness of that ruling, as we are satisfied that there is no constitutional infirmity in the statutory scheme attacked in this case no matter who are considered as properly complaining parties. For purposes of this opinion, we assume the county and all the municipalities are proper parties plaintiff.
*525 The statutory and historical bases for the assignment of certain welfare and judiciary-administrative costs and expenses by the Legislature to the counties, to be met by local taxation, are amply set forth in the trial court opinion and need not be recounted here. 141 N.J. Super. at 230-248 (judiciary-administration); Id. at 250-266 (welfare).
With respect to the welfare cost aspect of plaintiffs' grievance, the costs currently allocated to the counties (in gross) are (1) 25% of the cost of benefits and all administrative costs under the state program denominated Aid to Families of the Working Poor (AFWP), N.J.S.A. 44:13-1 et seq.; (2) 12 1/2% of the cost of benefits and the unreimbursed administrative costs of the federally-assisted Aid to Families with Dependent Children program (AFDC), and (3) 25% of the residual costs of benefits paid under the Supplemental Security Income (SSI) program, together with the cost of state-mandated services to recipients of SSI assistance.
By far the largest of these welfare programs is AFDC, with aggregate benefits and administrative costs of about $450,000,000 annually, the counties' share being about $66,000,000 (some $51,000,000 for benefits and $15,000,000 for administration). The next largest program is SSI, with about $109,000,000 in benefits, $5,000,000 payable by the counties.
The counties' allocated proportion of the total state judiciary-administration expense is much larger than in the case of welfare. According to the Annual Report of the Administrative Director of the Courts for 1975-1976, out of a total cost of $75,352,550, $58,959,437, or about 78%, was allocated to the counties.
The gravamen of the theoretical bases for the constitutional attacks by plaintiffs on these cost allocation plans is that both welfare and the operation of the judiciary are state functions and therefore the responsibility of the State. Consequently, imposing them on the counties essentially on the basis, in the case of welfare, of where the welfare recipients *526 are residents and, as to the courts, on the basis of where the courts physically function, is arbitrary and fundamentally unfair.
Plaintiffs' prime statistical resort for their theme of fundamental unfairness is a pair of tables showing the ratio of welfare and judiciary-administration costs in all the counties to their respective aggregate equalized assessed valuations. For 1974 the latter item ranges in terms of each $1,000 of valuations, from a high of $2.07 in Essex down to $.47 in Hunterdon. The heavily urbanized counties, as distinguished from the suburban-rural ones have, by and large, the higher cost ratios. With respect to welfare, the ratios vary from a high of $2.97 in Essex down to a low of $.19 in Bergen. Again, the ratios for the more urbanized counties are higher. Neither of these tables is surprising. Welfare clients are predominantly resident in the larger cities. The largest volume of litigation  the grist for the mill of the courts and court services  involves traffic accidents and criminal prosecutions, and these likewise center in the concentrated urban areas.
The basic constitutional inquiries in the case, accordingly, must revolve about the questions (a) whether the Legislature is arbitrary, irrational or fundamentally unfair in assigning a small portion of total welfare costs to the counties where the welfare recipients reside; and (b) whether the Legislature is arbitrary, irrational or fundamentally unfair in allocating the preponderance of the costs of operating the judicial system and related administration functions to the counties where the courts sit, having regard to the distinct correlation of the place of origin of the litigated controversies, civil and criminal, with the location of the courts and attendant services. It is our view that logic, history and authority combine to refute both of the aforestated postulates. There is little or no compelling judicial authority to the contrary.

*527 I  Equal Protection

The approach of plaintiffs to the equal protection issue, state and federal, is that since the functions under consideration are "state" functions, they must be supported by a system of costs which does not discriminate against any political subdivisions called upon to meet such costs. Invidious discrimination against Essex County, its municipalities and its taxpayers is asserted on the basis that the costs in question are disparately high for Essex in relation to its equalized assessed valuations and comparable indicia of ability to pay.
The argument falls, however, with the invalidity of the assumption that the functions in question are to be regarded as state functions as an absolutism  for any and all legal and constitutional purposes.
In an ultimate sense, all governmental services and functions below the federal level are "state" services and functions, whether the Legislature delegates their administration and the funding of their costs, in whole or in part, to local political subdivisions, county or municipal. This is so because the State Legislature controls and regulates them absolutely, subject only to constitutional conditions. Bergen County v. Port of New York Auth., 32 N.J. 303, 312-314 (1960). Nevertheless, as pertinently pointed out by the court in Robinson v. Cahill, supra, in meeting an equal protection attack on the system of financing the schools,
Notwithstanding that the Constitution conspicuously requires the State to provide these indispensable services, it has always been thought to be appropriate to call upon the local government, primarily the counties, to house the courts and to provide personnel necessary for their functioning. Today the bulk of the cost of the judiciary is thus allocated, as are also most of the expenses of criminal prosecutions and of probation services; and since real property ratables are the basic source of local revenues and the amount of judicial activity is not proportional to the amount of *528 ratables (or, for that matter, to population), the burden does not fall equally throughout the State.[1] [62 N.J. at 498]
In accord, in relation to school financing, see San Antonio School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
A similar approach was taken by the Supreme Court in A. & B. Auto Stores of Jones St., Inc. v. Newark, 59 N.J. 5, 18-19 (1971), where the court rejected an equal protection attack against the riot property damage act in which defendant city contended that liability should be distributed on a statewide rather than on a local basis. The court held that "it remains within the reasonable discretion of the Legislature to decide what group of taxpayers shall share in the burden, just as the Legislature does so with respect to so many other matters (the cost of welfare, education, police protection, the judiciary) as to which political arguments may be made that responsibility should be statewide or nationwide." Id. at 19.
As to the appropriateness of imposition of part of the burden of the costs of the courts on counties, see also Godfrey v. McGann, 37 N.J. 28, 34 (1962).
In our judgment, therefore, the absence of close correlation between the judiciary and welfare costs per county and equalized assessed valuations in the corresponding county is irrelevant to an equal protection analysis insofar as a county, its municipalities or its taxpayers claim to be the aggrieved class.[2] All that is necessary is a rational *529 relationship between the nature of the respective governmental functions involved and the political subdivisions to which the costs thereof are allocated. State v. Corbitt, 74 N.J. 379, 401 (1977); Humane Soc. of U.S. v. N.J. State Fish and Game Coun., 70 N.J. 565, 572-573 (1976) app. dism. 429 U.S. 1032, 97 S.Ct. 723, 50 L.Ed.2d 744 (1977); Hudson Circle Servicenter, Inc. v. Kearny, 70 N.J. 289, 316-317 (1976). Such a relationship is evident with respect to each of the two categories of cost under examination.
It is rational that counties wherein welfare clients reside bear a share of the cost of benefits and administration thereof. It was expressly so held in Lindsay v. Wyman, 372 F. Supp. 1360, 1366 (S.D.N.Y. 1974), aff'd sub nom. Beame v. Lavine, 419 U.S. 806, 95 S.Ct. 21, 42 L.Ed.2d 35 (1974). Providing the necessities of life of such people redounds to the benefit of the county locality in reducing crime, relieving health problems and promoting the general welfare of such localities in many other ways. The historical practice of requiring the expense of the poor to be met by municipalities further supports the rationality of the imposition. And, as argued by the State, since administration of some of these programs is delegated to county officials, the imposition of part of the cost on the counties may tend to promote efficiency in such administration.
Equally evident is the rational relationship between the nature and function of courts and the imposition of a part *530 of the costs of such courts and of court administration on the local political subdivisions where such courts are physically operative. Civil litigation, by virtue of rules of venue, largely concerns the affairs of county residents. Criminal litigation in the county courts involves crimes committed in the counties. It is thus self-evident that the operations of the judiciary in the county are for the benefit of the people of the county in at least the broad sense sufficient to make a case for rationality of the cost allocation scheme here under scrutiny.
To borrow the language of Chief Justice Weintraub in the A. & B. Auto Stores case, supra, the point to be made with respect to either welfare or judiciary-administrative costs is not whether "we individually applaud the legislative decision" as to these matters, "but rather that we cannot say the Legislature went beyond constitutional boundaries in putting the onus upon the taxpayers of the locality." 59 N.J. at 19.
It follows from the foregoing discussion that the fortuitously high incidence of blacks and the poor as residents in the more heavily burdened urban counties, cited by plaintiffs as added facets of denial of equal protection, is legally irrelevant to a tenable equal protection analysis. The statutory scheme in question obviously does not undertake to classify counties on the basis of the number of blacks or poor residents therein. See Washington v. Davis, 426 U.S. 229, 240-241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Jefferson v. Hackney, 406 U.S. 535, 546-547, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). Nor do blacks or the poor, as such, suffer from the manner in which these cost systems are ordered. If, as we believe has been shown above, there is a rational nexus between the counties where the services are received and those upon which a share of the pertinent costs is laid, the differences in the demographic and socio-economic characteristics of the counties affected are, indeed, fortuitous and constitutionally irrelevant in terms of equal protection.

*531 II  The Tax Clause of the Constitution

Plaintiffs contend that the financing schemes here implicated violate the constitutional principle of uniformity of taxation. Underlying the asserted position, however, is the same premise we discussed above in relation to plaintiffs' equal protection position  that welfare and judiciary-administration are absolutely and for all purposes "state" functions. In the present constitutional context, plaintiffs proceed from the stated premise to argue that the tax clause of the Constitution, Art. VII, § I, par. 1, which requires "uniform rules" of assessment for taxation, mandates the imposition of the stated expenses, if to be raised by realty taxation, on all the property in the State on a uniform statewide basis, and not separately county by county, according to where the costs are incurred. An identical argument was made and rejected by the Supreme Court in Robinson v. Cahill, supra:
* * * Plaintiffs invoke [the tax clause] this way: They say that since the 1875 amendment concerning public education imposed the school obligation on the State itself, a tax levied to discharge that obligation must be deemed a "State" tax rather than a "local" one and hence, if it is to fall upon property, must fall uniformly upon all taxable property throughout the State.
The short answer is that the tax clause was not intended to say that a State function may not be delegated to local government to be met by local taxation. As we noted in Point I, local government is simply an arm of the State with respect to the many State functions which the State decides shall be performed through local government. The tax clause does not restrict the State with respect to that decision. Rather it means that if the State decides to handle a service at State level and to do so on the basis of a property tax, it must tax all taxable property in the State rather than only property in a part of the State; and that if the responsibility for the State function is assigned to local government, the local tax must fall uniformly upon all taxable property within the county or the municipality as the case may be.[3] [62 N.J. at 502-503]
*532 It is of course evident that the last-stated precept has been followed in the instances of welfare and court administration. The fiscal responsibilities have, in varying degrees, been assigned to local responsibility and within each county levied uniformly upon all taxable property therein. Thus the constitutional principle of uniformity of taxation to raise the mandated costs in question has been faithfully followed.

III  Fair Taxation Principles Independent of Constitutional Requirements

Plaintiffs purport to find in "precedents of long standing" certain principles of taxation which, to their conception, condemn the statutory cost schemes under review. Typical are Jersey City v. Zink, 133 N.J.L. 437 (E. & A. 1945), cert. den. 326 U.S. 797, 66 S.Ct. 493, 90 L.Ed. 485 (1947); Van Cleve v. Passaic Valley Sewerage Comm'rs, 71 N.J.L. 574 (E. & A. 1905); Stratton v. Collins, 43 N.J.L. 562 (Sup. Ct. 1881); Lydecker v. Englewood, 41 N.J.L. 154 (Sup. Ct. 1879); State, Vail's Ex'rs. v. Runyon, 41 N.J.L. 98 (Sup. Ct. 1879); Baldwin v. Fuller, 39 N.J.L. 576 (Sup. Ct. 1877). The tenor of the statements in these opinions in which plaintiffs seek refuge is twofold: (a) that if a governmental subdivision is not given general self-governmental powers it may not be required to bear a governmental burden by taxation, and (b) a tax for state purposes must fall upon the state at large; for county purposes, upon the county, and for the public uses of lesser districts, upon such districts.
Neither of the broad propositions stated, even if deemed valid, is offended by the statutes here impugned. Counties are given a substantial degree of self-government; thus, imposing a locally incurred cost upon them to be raised by taxation of property in the county does not violate principle (a). The kind of legislation intended to be prohibited by that principle is exemplified by Van Cleve v. Passaic Valley Sewerage Comm'rs, supra, which held invalid *533 a statute authorizing the commissioners of a sewerage district to levy a tax upon all persons and property in an area not coterminous with the district, since, first, the district was not a general political district of the State, and, second, in no circumstances could it be allowed to tax property beyond its limits. Principle (b), supra, is cognate to (a). In a leading case reiterating it, Baldwin v. Fuller, supra, 39 N.J.L. at 578, the court held invalid the creation of a lamp light district with concomitant taxation of property therein because the taxed locality was "arbitrary," being narrower than the political district of which it was a part. Id. at 584.[4]
As to Jersey City v. Zink, supra, nothing set forth in the wide-ranging comments in the opinion of the court can properly be understood as necessarily authoritative beyond the context of the precise holding. This was that certain railroad tax revenues then in arrears and payable under existing law to certain municipalities wherein the tax property was situate could not constitutionally be appropriated by the State before payment and distributed to all the school districts of the state on the basis of school attendance. Legislation for that purpose was held violative of the constitutional prohibition against special legislation regulating the internal affairs of municipalities. 133 N.J.L. at 447. As the court said: "Under this provision of the constitution [prohibition of special laws] the state may not arbitrarily take funds from one municipality and allot them to another *534 * * *." Ibid. Nothing of that nature is effected by the legislation here under attack.

IV  The "Implicit Premise of Local Government"

Finally, plaintiffs seize upon a passing reference in Robinson v. Cahill, supra, to argue that the allegedly disproportionate burdens inherent in these financing systems violate "an implicit premise in the concept of local government that the State may not distribute its fiscal responsibility through that vehicle if substantial inequality will result." 62 N.J. at 500. However, it should be noted that the Robinson court did not assume the existence of such a "premise," but referred to the question of whether it existed. Nor did it reach the issue of whether local fiscal participation in educational costs violates any such principle, just as it refused to accept the equal protection attack. Expressing its reluctance in this regard, the court wrote:
Nor do we consider a question the parties have not projected, whether, apart from the equal protection guarantee, there is an implicit premise in the concept of local government that the State may not distribute its fiscal responsibility through that vehicle if substantial inequality will result. It may well be that at one time there was a rough correlation between the needs of an area and the local resources to meet them so that there was no conspicuous unfairness in assigning State obligations to the local units of government. Surely that is not true today in our State. Problems are now mobile. They have settled intensively in limited areas. State-wide there is no correlation between the local tax base and the number of pupils to be educated, or the number of the poor to be housed and clothed and fed, or the incidence of crime and juvenile delinquency, or the cost of police or fire protection, or the demands of the judicial process. Problems which are in no sense local in origin have become the special burden of those who cannot find a haven elsewhere.
We need hardly suggest the convulsive implications if home rule is vulnerable upon either of the grounds to which we have referred. Nor need we expound the difficulties of management of judicial solutions if the problem must be met by the courts.

[62 N.J. at 500-501]
*535 Respect for the views of Chief Justice Weintraub in adverting to the very possibility of such an implied premise in the concept of local government would preclude summary rejection of the hypothesis as not embodied in our State Constitution, either expressly or by judicial construction. Nevertheless, assuming the theoretical justification for such a principle as a general proposition, we would conclude that it is, in the present context, unworkable pragmatically, for the reasons advanced by the Chief Justice in the excerpt quoted above, and for others equally obvious. Therefore it would be unwarranted for an appellate court of this State on such a purely theoretical basis to strike down the fundamental and long-standing legislative policy decisions represented by the statutes involved. This is peculiarly the kind of situation in which long-held practices and concepts, imbedded in firm legislative policy, should be accorded the strong presumption of constitutionality. See Schaad v. Ocean Grove Camp Meeting Ass'n, 72 N.J. 237, 265, 269 (1977).
In sum, the issues raised by plaintiffs and amici in this case appear to us to present basic questions of public policy for resolution by the Legislature, not constitutional bars to be raised by the courts against legislative policies long extant.
Judgment affirmed.
NOTES
[1] We are well aware that our Supreme Court in Robinson v. Cahill, supra, did not reject, but rather passed the question as to whether the school financing laws violated equal protection. Nevertheless we regard the language of the court quoted above as implicitly rejecting that constitutional attack insofar as the court cost allocation system is concerned, and by clear analogy, the welfare cost system as well.
[2] Distinguish Robinson v. Cahill, supra, where sharp discordance between equalized assessed valuations per pupil-expenditure in the various school districts was held material to denial of equality of educational opportunity to pupils, which in turn was deemed the essence of the affirmative constitutional obligation of the State Const. (1947), Art. VIII, § IV, par. 1, to "provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State * * *." 62 N.J. at 520; Robinson v. Cahill, 69 N.J. 133, 141 (1975).

The Robinson decisions are, however, here pertinent in view of the fact that notwithstanding education is preeminently a "state" service, a substantial portion of the cost thereof was permitted by the Supreme Court in those decisions to be met by local taxation in the school districts where the children are educated. See Robinson v. Cahill, 69 N.J. 449 (1976), passim.
[3] The court was there alluding to the tax clause before its alteration by the Constitution of 1947. But the court went on to demonstrate that in the respects material to the discussion, the changes wrought by the Constitution of 1947 made no difference. 62 N.J. at 504-505.
[4] The approach of some of these older cases may be contrasted with that manifested by our courts in Meadowlands Reg. Div. Agency v. State, 112 N.J. Super. 89 (Ch. Div. 1970), aff'd 63 N.J. 35 (1973). There the court held valid the legislative creation of a meadowlands improvement district of quite limited governmental power, but containing a mandatory system of intermunicipal tax contributions. It was there said that the only limitation on the Legislature's power to delegate fiscal responsibility on local government is that "the expense must be for a public purpose and the statute which imposes it must be general and not special, private or local." 112 N.J. Super. at 110.