RAYMOND ROBBIANI, INDIVIDUALLY AND AS PRESIDENT OF THE FARMINGDALE BOARD OF EDUCATION, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION AND THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS, AND STANLEY C. VAN NESS, PUBLIC ADVOCATE, DEFENDANT.

Argued February 21, 1978—Decided July 31, 1978.

384

*Ms. Susan P. Gifis,* Deputy Attorney General, argued the cause for appellants (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

*Mr. Steven. A. Pardes* argued the cause for respondents (*Messrs. Sim, Sinn, Gunning, Serpentelli and Fitzsimmons,* attorneys; *Mr. Eugene D. Serpentelli,* of counsel).

No appearance was made on behalf of the Public Advocate.

The opinion of the court was delivered by

CONFORD, P. J. A. D. (temporarily assigned). The dispositive issue before the Court is the constitutionality *vel non* of *N. J. S. A.* 18A:33–5 which exempts from the mandatory school lunch program in the public schools, *N. J. S. A.* 18A:33–4, those individual schools in which under 5% of the enrolled pupils qualify economically for free or reduced price lunches. The Superior Court, Chancery Division, held the exemption to deny equal protection of the laws to otherwise qualified school children in schools exempted from the mandatory program. At the same time the court held the invalid exemption provision to be severable from the act as a whole, thereby mandating the lunch program in every public school in the State. The Appellate Division affirmed in an unpublished opinion, essentially for the reasons orally expressed by the trial judge.

The School Lunch Act, *L.* 1974, *c.* 53, reads as follows:

Each school district shall make school lunch available to all children enrolled in the district within 1 year from the effective date of this act. Such lunches shall meet minimum nutritional standards established by the Department of Education. Free and reduced price lunches shall be offered to all children qualifying under Statewide eligibility criteria. [*N. J. S. A.* 18A:33–4].

Any school in which less than 5% of pupils enrolled meet the eligibility requirements for a free or reduced price lunch shall be exempt from the provisions of this act. [*N. J. S. A.* 18A:33–5].

The legislative history of these provisions is of some significance in relation to the equal protection inquiry whether the exemption in Section 18A:33–5 bears some rational relationship to the purpose and object of the legislation as a whole. Similar legislation had been proposed in

the 1972 legislative session. Assembly Bill No. 1156 was captioned, "[a]n Act requiring that school lunch be made available to *all* children" (emphasis suppled), and contained no exemption for any schools. The accompanying statement noted that the bill's purpose was to assure access to lunch to "all public school children in every school district." The Assembly rejected the bill by a 67-2 vote, and did not again consider it as a body. 60 *Leg. Index* A-38 (No. 19 Jan. 15, 1974). The present act was submitted to the Assembly as Bill No. 442 in the 1974 session. With minor amendment, it passed in the Assembly by 67-5, again without an exemption provision. The bill then went to the Senate Education Committee where, by a 3-2 vote, it was disapproved. The committee then amended the bill by inserting for the first time the exemption now codified as *N. J. S. A.* 18A:33-5.[1] As thus amended, the bill passed in the Senate by 28-6 and the Assembly by 64-0. 61 *Leg. Index* A-12 (No. 18 July 22, 1974).

Responsibility for implementation of the act is vested in the Commissioner of Education, and has been delegated by him to the Bureau of Child Nutrition Programs of the Department of Education. Regulations concerning the providing of free and reduced price lunches are found in *N. J. A. C.* 6:79-1.1 *et seq.* Each school conducts an annual survey to determine which of its enrolled students are eligible for such lunches under bureau-established standards. *N. J. A. C.* 6:79-1.4.

Once a lunch program is undertaken, local school districts are reimbursed by the State at a variable rate for each lunch served, the rate being determined by both the concentration of needy children per school and whether a lunch is served free or at reduced or full price. Federal funds are available

---

[1]The exemption was estimated to reduce State expenditures under the act by some $500,000. See Senate Educ. Comm. Statement, Assembly Bill No. 442 (May 13, 1974).

to reimburse the districts for 75% of the cost of purchase and installation of equipment such as refrigerators. There is no funding for salaries of local personnel involved in implementation of a lunch program except when State reimbursement for lunches exceeds costs; neither is there reimbursement for construction of necessary physical facilities.

The instant action was brought by a number of individuals in their capacities both as school board presidents and municipal taxpayers, together with the boards themselves. The complaint charged that the 5% exemption provision in the law (1) denied plaintiffs equal protection of the laws, being arbitrary and without rational relationship to the purpose of the school lunch legislation; (2) "contravene[d] the thorough and efficient education mandated by the Constitution * * *"; and (3) "create[d] an undue burden on the plaintiffs." An injunction and a declaratory judgment were sought. Defendants Commissioner of Education and the State filed an answer and counterclaim seeking a declaration that the act was valid and an order compelling compliance with it by plaintiffs boards of education and other noncomplying school districts.

The Public Advocate was granted leave to intervene as a defendant. He originally took the position that the statute was valid. Later he urged that if the exemption provision was held invalid it should be deemed severable. On the appeal to the Appellate Division he argued: (a) that the exemption violated the 14th Amendment rights of the children in the exempted schools; and (b) the exemption provision of the act is severable. On the appeal to this Court the Public Advocate eschews any position in the matter, explaining that he fears that if the decision of the Appellate Division is affirmed new legislation is apt to be adopted cutting back on school lunches to needy pupils to a greater extent than the present act.

At the outset of the trial herein, the trial court granted summary judgment to defendants as against the plaintiff school boards on the ground that, as instrumentalities of

the State, they had no standing to challenge the legislation. No appeal has been taken from that action. After trial the court rendered a decision construing the action to be one by the taxpayer plaintiffs on behalf of needy school children who would be deprived of lunches under the 5% exemption.[2] The court concluded that the exemption was without rational basis in the purpose of the act because some children would be deprived of lunch regardless of their need and some schools would be forced to initiate a lunch program in a given year yet be exempted the following year because of a shift in the percentage of needy children at the school in that year. It therefore held the exemption invalid, and, holding the invalid provision severable, declared the law to require a lunch program in every school district. As noted above, the Appellate Division affirmed on the same reasoning. We granted certification on the petition of defendants. 75 *N. J.* 520 (1977).

At the trial plaintiffs adduced testimony from various school district officials to the effect that in some relatively small districts the operation of the 5% criterion would compel the institution of a lunch program and the corresponding need to purchase equipment therefor notwithstanding the fact that the percentage might subsequently fluctuate below and above the 5% level. In at least one district with more than one school the percentage threshold resulted in a larger number of needy children attending an exempt school than a complying school. However, because of State and federal financial assistance toward school lunch programs, local tax rates would be increased by only a few

---

[2]In doing so it ignored the fact that the plaintiffs' ultimate aim was to abrogate the statute in entirety by arguing that the invalid exemption provision was non-severable from the statute. Moreover the complaint charged that it was the plaintiffs (not the pupils) whose equal protection rights were violated by the statute.

cents on the dollar by implementation of such programs in any district.[3]

## I

The first question engaging our attention is whether there is anyone in the case having standing to raise the question of denial to needy school children of equal protection of the laws. It seems clear that plaintiffs, as taxpayers seeking to invalidate the entire lunch program, do not represent the interests of such children, even though they attack the exemption provision as a step toward their ultimate position in the case. It is therefore doubtful that these plaintiffs have standing to raise equal protection claims of children. Normally an individual will be permitted only to seek judicial vindication of his own rights. *Barrows v. Jackson,* 346 *U. S.* 249, 73 *S. Ct.* 1031, 97 *L. Ed.* 1586 (1953); *State v. Norflett,* 67 *N. J.* 268, 276 (1975).[4]

However, we need not resolve the matter of standing here because we find that the activity of the Public Advocate

---

[3]According to an affidavit submitted by defendants, of 2,459 schools operating in the State (as of April 5, 1976), 432 schools are exempt under the act and do not voluntarily provide a lunch program. The total of needy children in such schools numbers 3,903. The total number of needy children enrolled in schools required to provide a lunch program under the act is 289,164. An additional 8,487 needy children are voluntarily given lunch by schools exempt from the act. Thus the percentage of all needy children in the State not being afforded lunch is 1.35%.

[4]Exceptions to this rule have been invoked in some situations where a party alleges that his own injury necessarily deprives third parties of their constitutional rights. See, *e. g., Barrows v. Jackson, supra,* 346 *U. S.* at 257, 73 *S. Ct.* 1031 (enforcing a restrictive covenant against a white covenantor would deny blacks equal protection); *Pierce v. Society of Sisters,* 268 *U. S.* 510, 534, 535, 45 *S. Ct.* 571, 69 *L. Ed.* 1070 (1925) (if religious schools closed, parents, students and teachers would be denied substantive due process). No such nexus exists here; the interests of plaintiffs and school children are disparate. See generally Note, "Standing to Assert Constitutional Jus Tertii," 88 *Harv. L. Rev.* 423, 428–436 (1974).

in the case suffices to place before us the interests of the excluded school children. Furthermore, we conclude that the strong public interest in the resolution of this dispute warrants our consideration of the merits. *Busik v. Levine,* 63 *N. J.* 351, 363–364 ,(1973), app. dism. 414 *U. S.* 1106, 94 *S. Ct.* 831, 38 *L. Ed.* 2d 733 (1974).

## II

■ We thus address the merits of the equal protection attack as outlined above. Defendants defend the exemption provision on the following rationale. While the federal and State statutes look ultimately to the provision of school lunches for all needy children, both statutes, and the federal implementing regulations, contemplate some flexibility in relation to extent of coverage. As amended in 1970, the federal statute provided that "first priority * * * be given to providing free meals to the neediest children" 42 *U. S. C. A.* § 1758. In this connection the defendants also cite 7 *C. F. R.* § 210.4a (b) (5) (ii) directing "priority to schools in areas with a high concentration of needy children," as well as such supportive cases as *Davis v. Robinson,* 346 *F. Supp.* 847, 857 (D. R. I. 1972); *Justice v. Mount Vernon Bd. of Ed.,* 351 *F. Supp.* 1252, 1262 (S. D. N. Y. 1972); and *Richmond Welfare Rts. Org. v. Snodgrass,* 525 *F.* 2d 197, 201–205 (9 Cir. 1975). Thus, argue defendants, the purpose of the State statute may be stated as the provision generally of low cost lunches for children subject to an allowance for minimal local exemptions from mandatory coverage.[5] The object of the 5% exemption is to assure that, with due regard for fiscal constraints, lunches will be made available in areas of greatest concentration of need.

---

[5] It is to be noted that no contention has been made in this case that our statute does not comport with the federal statutes or regulations.

In short, the defendants contend that the statute under review passes muster from an equal protection standpoint in that the category of schools exempted from mandatory participation in the program under *N. J. S. A.* 18A:33–5 bears a rational relationship to the purpose of the act, that being conceived as the provision of low cost lunches to school children generally, with some fiscal leeway as to schools where the concentration of needy children is least. It is notable that neither of the lower courts in this case gave consideration to the stated justification for the classification made by the statute. It is equally apparent that under the view of the lower courts in this case the State has the choice only of a mandatory lunch program for every school in the State or none at all. It has not been argued that the State could not, if it chose, decline to make lunch programs mandatory in any school.

In approaching the equal protection issue here implicated we see no reason to depart from the traditional criterion of rationality of the classification, *i.e.*, whether there is "any conceivable state of facts which would afford reasonable support for [it]." *WHYY Inc. v. Glassboro*, 50 *N. J.* 6, 13 (1967) rev'd on other grounds 393 *U. S.* 117, 89 *S. Ct.* 286, 21 *L. Ed.* 2d 242 (1968); *Two Guys from Harrison, Inc. v. Furman*, 32 *N. J.* 199, 218 (1960); *N. J. Restaurant Assn. v. Holderman*, 24 *N. J.* 295, 300 (1957). The United States Supreme Court has consistently applied this standard in recent years in appraising social-welfare legislation for equal protection validity. *Idaho Department of Employment v. Smith*, 434 *U. S.* 100, 98 *S. Ct.* 327, 54 *L. Ed.* 2d 324, 327 (1977); *Jefferson v. Hackney*, 406 *U. S.* 535, 549, 92 *S. Ct.* 1724, 32 *L. Ed.* 2d 285 (1972); *Lindsey v. Normet*, 405 *U. S.* 56, 74, 92 *S. Ct.* 862, 31 *L. Ed.* 2d 36 (1972); *Dandridge v. Williams*, 397 *U. S.* 471, 485–486, 90 *S. Ct.* 1153, 25 *L. Ed.* 2d 491 (1970). The rational basis test was applied to an attack upon the implementation of the school lunch program in *Briggs v. Kerrigan*, 431 *F.* 2d 967, 968–969 (1 Cir. 1970) (upheld disparity based upon whether

school had previously installed kitchen facilities), but *cf. Justice v. Mount Vernon Bd. of Ed., supra* (351 *F. Supp.* at 1261–1262).

In particular contexts, however, this Court has in the recent past applied a "means-focused" standard for determining equal protection; *i. e.,* "whether there is an appropriate governmental interest suitably furthered by the differential treatment"; see *Bor. of Collingswood v. Ringgold,* 66 *N. J.* 350, 370 (1975) app. dism. 426 *U. S.* 901, 96 *S. Ct.* 2220, 48 *L. Ed.* 2d 826 (1976); *Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp.,* 71 *N. J.* 249, 281–287 (1976), *cert.* den. 430 *U. S.* 977, 97 *S. Ct.* 1672, 52 *L. Ed.* 2d 373 (1977). This approach requires more exacting judicial scrutiny than the conventional rational-basis test but less than that where "fundamental rights" and "suspect categories" are involved in the legislation.

We are satisfied that whether the test applied is rational-basis or means-focused the statute before us does not deny equal protection to school children. The financial savings to the State from the exemption amount to about $500,000 (as of 1974). There are also savings to the exempted districts. This, as well as a degree of deference to local autonomy, constitutes an "appropriate governmental interest" reasonably to be served by a legislative limitation of some sort on the program, at least for the time being.

As to the asserted anomaly that of two schools in a single district a smaller absolute number of needy pupils in one school may activate a mandatory program while a larger number in another school might not, this is merely a consequence of the legislative selection of schools rather than other possible quantitative units for measurement of needy pupil concentration. That choice is not demonstrated to be clearly an unreasonable one for the stated purpose. In equal protection terms, it is not fatal "that the legislative objective might be more fully achieved by another, more expansive classification." *N. J. Restaurant Assn. v. Holderman, supra* (24 *N. J.* at 300). "* * * [T]he Legislature may

recognize degrees of harm and hit the evil where it is most felt." *Ibid.*

We have no difficulty in finding the percentage criterion a reasonable one and the resulting exemption of the schools with the lowest proportionate concentration of needy pupils a means of recognizing the State's economy motive which is rationally related to the general purposes and objects of the legislation. Compare *Briggs v. Kerrigan, supra* (431 *F.* 2d 967).

### III

■ Plaintiffs made an alternative argument to the effect that the statutory exemption "inequitably burden[s] the taxpayers of the plaintiff school districts in violation of the equal protection clauses of the state and federal constitutions." The contention is that unreasonable burdens are placed on the "small and poorer" districts. Plaintiffs explain:

* * * The small districts will have to spend much greater per capita amounts than large districts to build and maintain lunchroom facilities. In the poor districts, where there will be a high number of children eligible for free or reduced price lunches, the taxpayers will have to provide the money for those lunches, while in the wealthier districts, where most children will pay for their lunches, the taxpayers will hardly be burdened at all. The system of financing the school lunch programs in New Jersey would be equitable only if the expenses were allocated on an equal statewide basis, rather than having a disproportionate and inequitable burden on taxpayers of certain districts.

Plaintiffs' only purported support for the assertions thus advanced consists of a *dictum* in *Robinson v. Cahill,* 62 *N. J.* 473 (1973), and an interlocutory decision of the Appellate Division in *Bonnet v. State,* 126 *N. J. Super.* 239 (1974). The reference to *Robinson* is to the Court's allusion, in that case, to "a question the parties have not projected, whether, apart from the equal protection guarantee, there is an implicit premise in the concept of local government that

the State may not distribute its fiscal responsibility through that vehicle if substantial inequality will result." 62 *N. J.* at 500. It will suffice, for present purposes, to observe that we did not, in *Robinson,* assume the existence of any such principle nor reach the issue of whether local fiscal participation in educational costs violated any such principle. Indeed, we pointed to the "convulsive implications if home rule [were] vulnerable upon" any such principle as well as to "the difficulties of management of judicial solutions" consequent thereupon. *Id.* at 501. Nothing decided in *Robinson v. Cahill* is of aid to plaintiffs in the present situation.

As to plaintiffs' reliance upon the *Bonnet* case, *supra,* the interlocutory decision there rendered by the Appellate Division — an affirmance of a denial of a motion to dismiss a complaint for failure to state a claim—was followed by a judgment in favor of defendants after trial, and an affirmance thereof by the Appellate Division. *Bonnet v. State,* 155 *N. J. Super.* 520 (App. Div. 1978), affirming the judgment reported in 141 *N. J. Super.* 177 (1976). In that case the complaint alleged that the present New Jersey system of distributing fiscal burdens, whereby counties are required to pay for part of certain judiciary and welfare program costs, denied plaintiff taxpayers, black residents and low-income families of equal protection of the laws and due process. The contention was rejected on the ground that, whether or not the functions in question were properly to be denominated as state rather than local in nature, the Legislature could properly delegate them to be borne in part by local governmental bodies. 155 *N. J. Super.* at 528. Thus *Bonnet* furnishes no support for the argument of the plaintiffs under consideration here since it is basically of the same tenor as that advanced and rejected by the Court in that case.

Insofar as asserted inequality of the burden of maintaining local schools is concerned, this Court ultimately upheld the facial constitutionality of the Public School Education Act of 1975 (*L.* 1975, *c.* 212). *Robinson v. Cahill,* 69 *N. J.* 449 (1976). That statute continues to rely to a substantial

extent on local financing of schools. The holding in *Robinson* is therefore entirely consistent with the statutory scheme of imposition on local school districts of the unreimbursed (by specific state and federal sources) cost of maintenance of school lunch programs through local property taxation assisted by State aid. No individual taxpayer in any such district has a legitimate constitutional complaint flowing from the school lunch statute.

## IV

As noted above, the complaint filed herein charged that the statutory exemption operated to "contravene the thorough and efficient education" mandated by the Constitution, presumably *N. J. Const.* (1947) Art. VIII, § IV, par. 1. However, although in advancing their equal protection argument, plaintiffs' brief makes the point that the school lunch program was adopted by the Legislature pursuant to the constitutional mandate for a thorough and efficient educational system, the brief is devoid of any contention that the exemption provision of the statute *sub judice* is invalid as negating a thorough and efficient system of education. The implications of such a contention, were it advanced, are of such serious consequence that we are clearly unjustified in addressing it on our own motion, on the sparse record before us, and without adequate adversarial briefing of the issue. We therefore do not address the question.

We conclude the statute is wholly valid.

Judgment reversed.

SULLIVAN, J. (dissenting in part). I would affirm the entire judgment. *N. J. S. A.* 18A:33–4 establishes a school lunch program not just for needy children but for "all children enrolled in the district."[1] Needy children get the addi-

---

[1] The statute was passed to take advantage of federal assistance provided under the National School Lunch Act, 42 *U. S. C. A.* §

tional benefit of being provided with the same lunches either free of cost or at reduced prices. The benefits of this kind of program to all children cannot be disputed.

On this score, the provision of *N. J. S. A.* 18A:33-5, which exempts a school entirely from the act if less than 5% of its pupils are needy, does not make sense. Not only needy children, but also all other children in such a school, suffer a deprivation of this worthwhile program. I agree with the trial judge that the exemption provision is plainly arbitrary, is invalid and is severable from the rest of the statute. I would affirm.

Justice PASHMAN joins in this dissent.

PASHMAN, J., dissenting. While I wholeheartedly endorse the majority's validation of *N. J. S. A.* 18A:33–4, I dissent from its refusal to affirm those parts of the decisions below which strike down *N. J. S. A.* 18A:33–5. That statute's exemption of schools where less than 5% of the pupils are sufficiently needy to meet the eligibility requirements for a free or reduced price lunch is a blunderbuss approach to economy. The statutory exception is plainly irrational when scrutinized in the light of the overall goal of the school lunch program — the feeding of needy children.[1] Moreover, it flies in the face of the applicable federal regulation, 7

1751, *et seq.*, and supplements thereto. This act declares it to be the policy of Congress "to safeguard the health and well being of the Nation's children * * * by assisting the State, through grants-in-aid and other means, in providing * * * for the establishment, maintenance, operation and expansion of nonprofit school-lunch programs."

[1]The following chart indicates the wide scope of the school lunch program in this State. Nearly 40% of the eligible students in our schools take part in the lunch program. Presumably, many others bring their own lunch and buy milk and/or dessert. Of the participating students, nearly 50% are eligible for free or reduced price lunches. This group comprises over 22% of the total number of students eligible to take part in the school lunch program.

*C. F. R.* § 210.5a(b)(5)(ii), which directs the priority of the school lunch program to "schools in areas with a high concentration of needy children."

Under the formula employed in *N. J. S. A.* 18A:33–5, a school of 1,000 students with 49 needy children need not supply free or reduced price lunches while a school of 100 students with 5 such children must supply lunches.[2] The

| Type of Lunch | October 1977 Eligible Students | October 1977 Participating Students | February 1978 Participating Students |
|---|---|---|---|
| Paid | 1,044,203 | 280,931 | 276,628 |
| Reduced | 52,789 | 30,935 | 31,440 |
| Free | 285,204 | 236,743 | 242,922 |
| Total | 1,382,196 | 548,609 | 550,990 |

The chart below shows how small the cost to the State is when compared to the federal subsidy.

Cost Apportionment of the Lunch Program Shown in Cents

| | Total Cost to Government | Federal Share | State Share |
|---|---|---|---|
| Free lunches | 93.9 | 79.5 | 14.4 |
| Reduced price | 83.9 | 69.5 | 14.4 |
| Subsidized fully paid | 20.5 | 14.5 | 6.0 |

[2]Plaintiff's complaint lists some interesting figures which resulted from surveys by several Boards of Education. The following chart notes some of the most flagrant differences for the 1975–1976 school year between numbers of eligible students in covered and exempted schools.

| Town | School | Total Enrollment | Students Eligible | 5% Equivalent |
|---|---|---|---|---|
| *Hazlet | Sycamore Drive | 400 | 22 | 20 |
| *Haddon | Jennings | 162 | 15 | 8.10 |
| *Woodland | Avon | 237 | 17 | 11.85 |
| Haddon | Haddon High | 1,480 | 62 | 74 |
| Raritan | Raritan High | 2,012 | 48 | 100.6 |

* Denotes school required to provide reduced price or free lunches. The other two schools were exempted by *N. J. S. A.* 18A:33–5.

Two points are apparent. First, the present scheme disproportionally impacts on small schools. Second, in many cases schools with large numbers of undernourished children are not compelled to provide lunches for them at a reduced price or free of charge, even though the actual number of hungry children is substantial.

above example demonstrates the fallacy of the majority's reasoning that *N. J. S. A.* 18A:33-5 "bears a rational relationship to the purpose of the act, that being conceived as the provision of low cost lunches to school children generally, with some fiscal leeway as to schools where the concentration of needy children is least." See *ante* at 391. To reasonably meet the above stated purpose of the act, the statutory exemption would have to deal with actual numbers of eligible pupils and not mere percentages.

The pure rational basis test indulged in by the majority is singularly inappropriate in this context. The right to a thorough and efficient education is fundamental in New Jersey. *N. J. Const.* (1947), Art. VIII, §4, par. 1 reads as follows:

The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of *all* the children in the State between the ages of five and eighteen years. (emphasis added)

Surely any legislative differentiation which unreasonably reduces the opportunity of some children to learn is inherently suspect. Even the rationale of the United States Supreme Court in *San Antonio School District v. Rodriquez,* 411 *U. S.* 1, 93 *S. Ct.* 1278, 36 *L. Ed.* 2d 16 (1973), where it was held that differences in per-pupil expenditures do not necessarily establish an inequality of educational opportunity, would dictate an affirmance in this case. There, Justice Powell's majority opinion noted that

[I]n support of their charge that the system discriminates against the "poor," appellees have made no effort to demonstrate that it operates to the peculiar disadvantage of any class fairly definable as indigent, or as composed of persons whose incomes are beneath any designated poverty level. Indeed, there is reason to believe that the poorest families are not necessarily clustered in the poorest property districts.

[411 *U. S.* at 22-23, 93 *S. Ct.* at 1291, 36 *L. Ed.* 2d at 36-37]

The classification in *N. J. S. A.* 18A:33–5 is precisely tailored to impact upon poor children in schools where they comprise a minority. The insidiousness of the deprivation is all the more patent in this context. More fortunate, well-nourished classmates who make up the vast majority of the student body at these schools will have an unfair advantage in academic endeavors over these poor children who qualify for free or reduced price lunches but are denied them because of their insufficient number.

I do not believe that the exemption provision can withstand the test of *Taxpayer Ass'n of Weymouth Tp. v. Weymouth Tp.,* 71 *N. J.* 249, 281–287 (1976), *cert.* den. 430 *U. S.* 977, 97 *S. Ct.* 1672, 52 *L. Ed.* 2d 373 (1977) for the reasonableness of legislative classifications. The majority has glossed over the sliding scale approach which *Robinson v. Cahill,* 62 *N. J.* 473 (1973) *cert.* den. 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219 (1973) and *Weymouth* mandate for the scrutiny of statutory classifications which impinge upon basic personal rights.

* * * *[m]echanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary.* In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. * * *

[62 *N. J.* at 492; emphasis added]

* * * [w]here an important personal right is affected by governmental action, this Court often requires the public authority to demonstrate a greater "public need" than is traditionally required in construing the federal constitution. Specifically, it must be shown that there is an "appropriate governmental interest suitably furthered by the differential treatment." [citations omitted] *Even under more traditional approaches, New Jersey has always required a real and substantial relationship between the classification and the governmental interest which it purportedly serves.* [citations omitted]

[71 *N. J.* at 286–287; emphasis added]

The public need for a limited saving of funds is not nearly so compelling as is the need of these unfortunate children for all reasonable societal assistance which will help them have a fair chance in life.

The excuse of scarce resources did not prevail in *Robinson v. Cahill, supra,* and should not succeed here. In *Robinson* we held that the amount of per-pupil expenditures required to provide a thorough and efficient education for each child was a minimal requirement for all children.

> The trial court found the constitutional demand had not been met and did so on the basis of discrepancies in dollar input per pupil. We agree. We deal with the problem in those terms because dollar input is plainly relevant and because we have been shown no other viable criterion for measuring compliance with the constitutional mandate. The constitutional mandate could not be said to be satisfied unless we were to suppose the unlikely proposition that the lowest level of dollar performance happens to coincide with the constitutional mandate and that all efforts beyond the lowest level are attributable to local decisions to do more than the State was obliged to do.
>
> [62 *N. J.* at 515–516]

Furthermore, I agree with Judge Frankel's suggestion in *Justice v. Board of Education,* 351 *F. Supp.* 1252 (S. D. N. Y. 1972), that the denial of free or reduced price lunches in some schools which have eligible children would deny them equal protection where other schools in the same district take part in the National School Lunch Act, 42 *U. S. C.* § 1751 *et seq.,* and feed similarly situated children.

> While this is determined as a nonconstitutional matter, it is fitting to recognize that constitutional rumblings are in the near background. Mount Vernon's arrangements might get by if the test of equal protection were the only issue. They *might* . . . but it is fair to say that the question would be one of substance. Glaring inequalities in the dispensation of elemental necessities within a single city — indeed, within single families — surely trigger arresting thoughts about the limits of permissible discriminations. *The explanation — about available "facilities" and budgetary strains — might turn out to seem rational enough, but it is scarcely compelling. It is at best depressing to know that everyone's desire to nourish*

*children may founder upon such obstacles — in a country that has
known how to feed adults in murderous pursuits on unpacific atolls,
in jungles, on deserts, at sea, and in space.* Without reaching them
for decision, we may recognize that plaintiffs' constitutional claims
are neither frivolous nor immaterial on the subject of statutory in-
terpretation.

> [351 *F. Supp.* at 1261–1262; emphasis added;
> footnote omitted]

In this case I have reached the equal protection issue and
have found that there is no compelling reason to deny a re-
duced price or free lunch to any child made eligible due to
the poverty of his or her family.

The majority takes comfort in the fact that only a small
percentage of needy children go unfed. See *ante* at 389, n. 3.
This fact is of little relevance if a child's ability to learn is
directly related to his not suffering from hunger and malnu-
trition, as it undeniably is. The Court hides behind tradi-
tional views of judicial restraint in avoiding the question of
whether being fed a minimal amount of nutritional food is
required for one to have a reasonable opportunity to learn. I
for one do not need an appellate brief and oral argument to
persuade me that hungry children do not learn very well. *See
Justice v. Mount Vernon Bd. of Ed., supra,* 351 *F. Supp.* at
1257; *Final Report, White House Conf. on Food, Nutrition
and Health* at 46. In *Justice, supra,* Judge Frankel made
the following pertinent observation:

Two distinguished scholar-scientists, submitting unquestioned affi-
davits for the plaintiffs before us, *make vivid what we all know* when
they report that the miseries of hunger lead to listlessness, irritabil-
ity, other emotional ills, and a generally diminished ability to profit
from either education or the world's other opportunities.

> [351 *F. Supp.* at 1257; emphasis added]

The need of a minimally balanced diet is clearly a necessity
for proper concentration and the ability to learn. I would
hold that guaranteeing *all* children the opportunity to be
served at least one balanced meal per day at school is
required as one of the minimal elements of a thorough and

efficient education for all children. To me, this is self-evident. The statutory scheme goes far to ensure that most needy children will receive this benefit; its invidious denial thereof to a small minority of those children is totally unreasonable.

Moreover, looking at this problem from a purely economic view leads to the inevitable conclusion that the exemption is irrational. Education is a prerequisite to earning a living and meaningful membership in American society. While a college degree may not be a mandatory requirement for the good life, an intelligent awareness of the workings of modern society and the fundamentals of reading, writing and mathematics certainly are minimum preconditions to a successful career today. In *Robinson v. Cahill, supra,* we held that a thorough and efficient education represented that "educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market." 62 *N. J.* at 515. Hungry children are denied such an opportunity.

The majority closes its eyes to the fact that this is a "pay *some now* or pay *more later*" proposition. Most hungry children who are not permitted to achieve a thorough and efficient education will not succeed as adults and will be condemned to the vicious cycle of poverty which exists in this country. The long-term cost to society in providing for those unfortunates who have been derailed from the track of successfully coping with life's challenges will far exceed the cost of providing this lunch program. I would prefer to give less fortunate children a fair chance to succeed through the opportunity to gain an education. To me a meaningful opportunity to learn is the birthright of every New Jerseyan.

Moreover, I agree with the courts below that *N. J. S. A.* 18A:33–5 is severable from *N. J. S. A.* 18A:33–4. The mere fact that the School Lunch Act, *L.* 1974, *c.* 53 failed by a 3–2 vote to make it through the Senate Education Committee until the exemption section was added is not dispositive. The trend in recent years has been for courts to uphold legislation where a generally valid act has an invalid

provision or exception. *See Mitchell v. Mobile County*, 313 *So.* 2d 172, 175 (Ala. Sup. Ct. 1975); *In re Kapperman*, 11 *Cal.* 3d 542, 114 *Cal. Rptr.* 97, 522 *P.* 2d 657, 662 (1974); *State v. Watkins*, 259 *S. C.* 185, 191 *S. E.* 2d 135, 144 (1972); *Carr v. Campbell Soup Co.*, 124 *N. J. Super.* 382, 388 (App. Div. 1973); *Percival v. City of Philadelphia*, 12 *Pa. Cmwlth.* 628, 317 *A.* 2d 667, 672–674 (Pa. Cmwlth. Ct. 1974), vacated on other grounds, 464 *Pa.* 308, 346 *A.* 2d 754 (1975). Moreover, "[t]here is less reluctance to reach this kind of result . . . when the repugnant limiting provision was added by way of amendment during the course of enactment because of the fact that the bill was originally introduced without it furnishes some support for the view that the offending limitation is not essential to the successful operation of the legislation." 2 Sutherland, *Statutory Construction*, § 44.13 at 359 (Sands ed. 1973); *Carr v. Campbell Soup Co.*, *supra. See also Lynden Transport, Inc. v. Alaska*, 532 *P.* 2d 700, 715 (Alaska Sup. Ct. 1975); *Hayes v. Superior Court of San Bernardino County*, 6 *Cal.* 3d 216, 98 *Cal. Rptr.* 449, 453, 490 *P.* 2d 1137, 1141 (Cal. 1971), app. dismissed 406 *U. S.* 940, 95 *S. Ct.* 2048, 32 *L. Ed.* 2d 328 (1972).

I can only conclude that had the Legislature been forced to choose, in the final analysis, between requiring lunch for all needy children or for no needy children, it would have fed all of those children. The trial court was correct in concluding that the purpose behind the Act was the feeding of children and that notwithstanding the negative Senate Education Committee vote, enactment without the exemption section would have occurred. Moreover, the Legislature has announced a general policy that any provision in Title 18A should be severable in preference to permitting a whole Act to fall.

If any provision of any section, article, subarticle, chapter or title of this law shall be adjudged by any court of competent jurisdiction to be ineffective, such determination shall not affect or impair the remaining provisions thereof but shall be confined in its opera-

tion to the provisions directly involved in a controversy in which said determination shall have been rendered.

[*N. J. S. A.* 18A:76–2]

Thus, I would affirm the lower courts in full and give all needy children the benefit of the salutary intent behind *N. J. S. A.* 18A:33–4. This disposition would be consistent with the principal object of the statute far more than would invalidating the act as a whole, which would totally deny the intent of the Legislature. In *Affiliated Distiller Brands Corp. v. Sills,* 60 *N. J.* 342, 345 (1972), we held that "[s]everability is a question of legislative intent. That intent must be determined on the basis of whether the objectionable feature can be excised without substantial impairment of the statute." See *Inganamort v. Borough of Fort Lee,* 72 *N. J.* 412, 422 (1977). "Courts will enforce severability where the invalid portion is independent and the remaining portion forms a complete act within itself." *Inganamort, supra* at 423. I find that *N. J. S. A.* 18A:33–5 is severable from the School Lunch Act and that *N. J. S. A.* 18A:33–4 is capable of standing alone as a fully independent statute.

SCHREIBER, J., dissenting in part and concurring in part. Critically involved in this case are the rights of school children, who, though eligible for free or reduced-price lunches, are deprived of those lunches because they are enrolled in schools in which they number less than 5% of the total enrollment. "Hunger has no regard for the school attended." *Richmond Welfare Rights Organization v. Snodgrass,* 525 *F.* 2d 197, 201 (9th Cir. 1975). Before approving such a classification, the Court should explore the Legislature's constitutional duty under Art. VIII, § 4, par. 1 of the New Jersey Constitution which directs that:

The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of *all* the children in this State between the ages of five and eighteen years. [Emphasis supplied]

When in 1974 the Legislature passed *N. J. S. A.* 18A:33–4 providing that each school district shall make free and reduced-price lunches available to *all* children qualifying under statewide eligibility criteria, it must have been aware of three factors, (1) the federal funds which would be available to assist in the financing, (2) the field experience of the federal program, and (3) its constitutional obligation to the school children in this State.

The Legislature undoubtedly found that in 1946 Congress enacted the National School Lunch Act "to safeguard the health and well-being of the Nation's children." 42 *U. S. C. A.* § 1751 *et seq.* The scheme of the Act contemplated a matching fund program with states which chose to meet minimum nutritional requirements of needy school children. After 20 years experience Congress passed the Child Nutrition Act of 1966, 42 *U. S. C. A.* § 1771 *et seq.*, in which it recognized "the demonstrated relationship between food and good nutrition and the capacity of children to develop and learn, based on the years of cumulative successful experience under the national school lunch program * * *." 42 *U. S. C. A.* § 1771. Congressional understanding of the importance of adequate nutrition for school children is further reflected in the following comment made by Vice-President (then Senator) Mondale during deliberations on 1972 amendments to the National School Lunch Act:

If we had to make a choice between textbooks and nutrition, it would be wiser to forego the textbooks and feed the children so that they would be capable of learning. [116 *Cong. Rec.* 4409 (1970)]

It is small wonder then that our Legislature recognized the importance of assuring every needy school child an opportunity to be served at least one balanced meal per day at school. Furthermore, in asserting that requirement in the public school educational program, the Legislature could not have been unaware of its constitutional responsibility. In 1973 Chief Justice Weintraub had reminded all

in *Robinson v. Cahill*, 62 *N. J.* 473, *cert.* den. 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219 (1973) (*Robinson I*), that it was the State's obligation "to maintain and support a thorough and efficient system of free public schools," 62 *N. J.* at 509, and that it was the State which "must define in some discernible way the educational obligation." *Id.* at 519.

We have previously acknowledged that a multitude of factors in addition to dollars expended per pupil

play a vital role in the educational result — to name a few, individual and group disadvantages, use of compensatory techniques for the disadvantaged and handicapped, variation in availability of qualified teachers in different areas, effectiveness in teaching methods and evaluation thereof, professionalism at every level of the system, meaningful curricula, exercise of authority and discipline, and adequacy of overall goals fixed at the policy level. Hence while funding is an undeniable pragmatic consideration, it is not the overriding answer to the educational problem, whatever the constitutional solution ultimately required. [*Robinson v. Cahill*, 69 *N. J.* 133, 141 n. 3 (1975) (*Robinson IV*)]

The components of a thorough and efficient education are not static. For example, in the late nineteenth century, secondary schooling was not generally available and for that reason was not deemed an attribute of a thorough and efficient system of public schooling. See *Landis v. Ashworth*, 57 *N. J. L.* 509, 512 (Sup. Ct. 1895). Today, a high school education is an integral part of a thorough and efficient public educational system. Chief Justice Weintraub pointed out this developing aspect of a thorough and efficient system when he wrote:

The Constitution's guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market. [*Robinson I, supra*, 62 *N. J.* at 515]

We may presume that when the Legislature, cognizant of the empirical data that hunger and proper nutrition are directly related to a child's educational opportunity, enacted

*N. J. S. A.* 18A:33–4, which required that free and reduced-price school lunches be available to all children who qualified under statewide eligibility criteria, it was acknowledging another element in the definition of a thorough and efficient system of instruction.

However, that system of instruction must be made available to all on the same basis. It is significant that the Chief Justice in *Robinson I* quoted approvingly the following language from *Landis v. Ashworth, supra,* referring to the constitutional requirement:

Its purpose was to impose on the legislature a duty of providing for a thorough and efficient system of free schools, capable of affording *to every child such instruction as is necessary to fit it for the ordinary duties of citizenship;* and such provision our school laws would make, if properly executed, with the view of securing the common rights of all before tendering peculiar advantages to any. [57 *N. J. L.* at 512 (quoted at 62 *N. J.* at 514) ; emphasis supplied]

Provision of this indispensable educational attribute to only those needy pupils who attend schools in which 5% or more of the students are eligible for a free or reduced-price lunch conflicts with the constitutional mandate that the system be established for *"all"* the children.

The majority correctly states that, although the complaint alleged that the 5% exemption contravened the thorough and efficient requirement in our Constitution, the issue has not been briefed nor the record fully developed. However, the consequences to the excluded children are so serious that we would be remiss indeed if we did not face up to the issue. Accordingly, I would remand the cause to enable the parties to present whatever relevant evidence they desire on this question.

*For reversal*—Chief Justice HUGHES, Justices CLIFFORD and HANDLER and Judge CONFORD—4.

*For affirmance*—Justices SULLIVAN and PASHMAN—2.

*For remandment*—Justice SCHREIBER—1.